Marshall, C. J.
 

 (dissenting).
 

 The majority
 
 *409
 
 opinion fully and correctly states the facts. I can not agree with the conclusions of the majority.
 

 There are two important considerations in every lawsuit — first, and most important, that justice be done between the
 
 parties;
 
 and, second, that in reaching a judgment the court should not do violence to sound rules of law.
 

 First. It is conceded by the majority opinion that a gross injustice was done to the plaintiff, because, regardless of the merits of the case, it was deemed to have sufficient merit to justify its sub mission to a jury, and it was properly submitted to the jury for their deliberation and verdict. The jurors were arbiters of the facts, and instead of determining where the truth lies upon the facts submitted to them by a careful consideration of the evidence, ánd by finding the ultimate fact, it appears by the tendered affidavits of two jurors that one of the jurors, whose vote was necessary to the determination of the case, followed the reprehensible course of casting lots. Inasmuch as there were ten other jurors who could have denied the truth of these affidavits, and who have not seen fit to do so, and inasmuch as the particular juror who is charged with violating his solemn oath as a juror has not seen fit to controvert the truth of those affidavits, it will be presumed for the purposes of this discussion that there was misconduct to the prejudice of the plaintiff.
 

 . Second. If the rule excluding the testimony of jurors is a sound rule of law, it should be followed even though an injustice should result in this particular case.
 

 
 *410
 
 It is my purpose to challenge the soundness of the rule.
 

 It is not questioned that in 1785, in a cause then pending in England in the King’s Bench Division, Lord Chief Justice Mansfield, without any legislative authority therefor, and reversing a well-settled rule to the contrary, which had prevailed for a long time, declared the rule which is followed in the majority opinion. That was the case of
 
 Vaise
 
 v.
 
 Delaval,
 
 1 T. R., 11 (K. B.), and that case differed from the instant case only in the fact that the entire jury in that case were guilty of tossing the coin, while in the instant case only one juror, his vote being necessary to a decision, was guilty of the misconduct. It is therefore interesting to learn upon what reason Lord Mansfield reached a conclusion contrary to the rule which had theretofore prevailed in England, and it is found by an examination of the record of that case that the new rule was supported by no reason whatever. The following is the entire opinion of the court:
 

 “The court cannot receive such an affidavit from any of the jurymen themselves, in all of whom such conduct is a very high misdemeanor; but in every such case the court must derive their knowledge from some other source, such as from some person having seen the transaction through a window, or by some such other means.”
 

 Immediately after that decision other English courts began to follow the rule, and in time the rule received recognition in this country, and it must be admitted that it is now quite generally adhered to. except in quite a number of states
 
 *411
 
 where a statute has been passed affirmatively overthrowing this pernicious doctrine. There are, however, a few states of the Union whose courts refuse to follow the rule where it has not been overthrown by statute. I have examined a large number of English and American cases which have followed the rule of Lord Mansfield, and almost without exception the courts have deplored the injustice done to the parties and have followed the rule on the alleged ground that it would be against policy to receive the testimony of jurors under such circumstances. It is only in a very few eases that the courts have entered upon any discussion of the soundness of the rule, and I am bound to say in all sincerity that I do not find upon an examination of those attempts a single sound reason in support of the rule. The alleged reasons given are that a juror comes into court with a bad grace in attempting to prove his own dishonorable conduct and to stigmatize his companions, and that it might make it necessary for a court to prosecute jurors criminally. It should require no argument whatever to show the fallacy of such alleged reasons.
 

 In the first place, it is not bad grace on the part of a juror to repent his misconduct and express a desire to have his action recalled in order that justice may be done between litigants, and if his confession does in fact stigmatize other jurors they may be heard in their own defense. In any event, it is much better that the testimony be received, thereby offering to the jurors who may be stigmatized an opportunity to make their defense, than to merely place the affidavits on file where the pub-
 
 *412
 
 lie may know what has happened, with the attendant discredit upon court proceedings and the consequent pollution of the stream of justice, only to be advised by the courts that even though injustice is done there should be no official exposure of such an unholy truth.
 

 If the opinion of Lord Mansfield is worthy of being called an opinion at all it is certainly subject to severe criticism. It virtually says that the reprehensible conduct of a juror should only be exposed by evidence obtained through other reprehensible conduct, to-wit, eavesdropping. The rule has been criticized severely, and the courts have refused to follow it in the following cases:
 
 Smith
 
 v.
 
 Cheetham,
 
 3 Caines (N. Y.), 57, 59;
 
 Crawford
 
 v.
 
 State,
 
 2 Yerg. (Tenn.), 60, 67, 24 Am. Dec., 467;
 
 Wright
 
 v.
 
 Illinois & Mississippi Telegraph Co.,
 
 20 Iowa, 195, 210, and
 
 Perry
 
 v.
 
 Bailey,
 
 12 Kan., 539, 544.
 

 The reasoning of the courts in all of these cases seems to me unanswerable. From the
 
 Tennessee case
 
 I quote the following, page 69:
 

 “A
 
 verdict under such circumstances is to be approached with great caution and great circumspection, but it is not altogether intangible, and beyond the reach of the redressing power of the court; if it were, I for one would think it a defect * * * in the policy of the law. ’ ’
 

 In the
 
 Iowa case
 
 is the following, page 212:
 

 “It is true, however, that public policy does require that, when a juror has discharged his duty and rendered a verdict, such verdict should remain undisturbed and unaffected by any subsequent change of opinion upon any fact or pretext
 
 *413
 
 whatever; and, therefore a juror should not be heard to contradict or impeach that which, in the legitimate discharge of his duty, he has solemnly asseverated. But when he has done an act entirely independent and outside of his duty and in violation of it and the law, there can be no sound public policy which should prevent a court from hearing the best evidence of which the matter is susceptible, in order to administer justice to the party whose rights have been prejudiced by such unlawful act. In other words, public policy protects a juror in the legitimate discharge of his duty, and sanctifies the result attained thereby; but if he steps aside from his duty, and does an unlawful act, he is a competent witness to prove such fact, and thereby prevent the sanction of the law from attaching to that which would otherwise be color-ably lawful.”
 

 In the
 
 Kansas case
 
 the court discussed the sound public policy of forbidding disclosures of matters which should rest in the personal conscience of
 
 a
 
 juror, and then declared the following conclusion, page 545 :
 

 “But as to overt acts, they are accessible to the knowledge of all the jurors; if one affirms misconduct, the remaining eleven can deny; one cannot disturb the action of the twelve; it is useless to tamper with one, for the eleven may be heard.”
 

 In the
 
 New York case,
 
 at page 59, the court propounded these pertinent inquiries:
 

 “I£ a man will voluntarily charge himself with a misdemeanor, why should he not be indulged? Are not criminals in
 
 England
 
 every day convicted,
 
 *414
 
 and even ■ executed on their own confession? And is not our state prison filled in the same way?”
 

 I entertain the strongest convictions of the efficacy of the jury system, but I deny that it is entitled to protection against disclosures of criminal or other reprehensible conduct, and I assert that it only tends to discredit the jury system, and therefore to measurably bring the entire judicial system into disrepute, to deny to jurors the right to testify concerning misconduct in the jury room. Persons accused of crime are permitted to plead guilty, and their confessions obtained by proper means may be received in evidence. Other public officials are permitted to make voluntary confession of malfeasance in office, and it is impossible to conceive any reason why jurors should be placed in. a class by themselves.
 

 The decisions of the courts of Ohio have not been entirely consistent upon this question. In the case of
 
 Farrer
 
 v.
 
 State,
 
 2 Ohio St., 54, it was stated in the opinion of Judge Corwin, on page 58, that in his opinion after the foundation had been laid by the testimony of the sheriff of the misconduct of the jury, the testimony of the jurors themselves became competent. Prom page 56 I quote the following:
 

 “I have no doubt, the general rule of policy, and a just regard to the sanctity of the province in which the jury is appointed to act, are against the reception of such evidence, in an ordinary case; but in one where life or even liberty is threatened by misconduct of the jury, it will readily be conceived, that circumstances may exist which would not only admit, but demand, the examination of
 
 *415
 
 members of tbe jury, as to their alleged bad behavior. ’ ’
 

 Can it be that one rule prevails in civil eases and that another and a different rule prevails where life and liberty are at stake?
 

 In
 
 Goins
 
 v.
 
 State,
 
 46 Ohio St., 457, 21 N. E., 476, the judgment of the lower courts was reversed on other grounds, and it was therefore not necessary to base the reversal upon the jury’s misconduct. In that case affidavits of two jurors were tendered, showing that the verdict had been reached by lot, without other evidence of such misconduct and without denial on the part of other jurors. The defendant in that case was indicted and tried for first degree murder. There was a conviction for manslaughter. After commenting upon the fact that the judgment of the lower courts was reversed upon other grounds, thereby making it unnecessary to determine the validity of the rule rejecting the testimony of jurors, Bradbury, J., at page 472 (21 N. E., 482), concluded with the following observation :
 

 “But a case like this at bar strains the principle to its utmost tension, and suggests a doubt whether there may not be found a carefully guarded exception to a rule, the universal application of which may present a spectacle so discreditable to our jury system.”
 

 I do not agree with the majority opinion in the instant case that no power is vested in this court to modify or abrogate this rule, and that such power is “vested in the legislative branch alone.” The rule never had any force beyond that of a common-law principle, and surely the principles of
 
 *416
 
 the common law declared by the English courts are not binding upon the courts of the United States, except in so far as they are commended by their essential soundness.
 

 Having thus far dealt with this question as a common-law principle, I desire to call attention to the state of the Ohio statutes upon the subject of competency of witnesses.
 

 Section 11493, General Code, provides:
 

 “All persons are competent witnesses except those of unsound mind, and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly.”
 

 Section 11494, General Code, declares what com munications are privileged, and defines the limitations of such privilege. Needless to state, that section makes no reference whatever to the testimony of jurors. The Legislature of Ohio having-invaded that field, the maxim
 
 “expressio unius est exdusio
 
 alterius” applies with full force, and it will be presumed that the Legislature did not intend that courts should extend the limitations of privilege beyond the plain provisions of that section.
 

 I therefore insist that both upon principle and upon authority of the statutes of Ohio the rule of Lord Mansfield should not be followed.
 

 A judicial inquiry, whether civil or criminal, is not a game of chance, but, on the contrary, is a simple inquiry as to where the truth lies upon the issues of fact involved, and the application of correct principles of law to the facts found. Un
 
 *417
 
 fortunately for the cause of jurisprudence, very many people have conceived the notion that legal principles have so many technical angles, and legal procedure is so hedged about by technical rules, that the truth is often suppressed or concealed by an unscrupulous party or a skillful practitioner, with the full knowledge on the part of the court that an injustice is being ■ perpetrated. Such a conception is as unfortunate as it is unjust. To correct this false notion should be the task of the bench and bar. Like Caesar’s wife the administration of justice must be above suspicion. Any rule of long standing should generally be followed, but when it clearly appears that the rule is wrong there should be no hesitation in reversing it.
 

 In addition to what has already been stated, J should perhaps make an explanation of a statement found in my dissenting opinion in
 
 Long
 
 v.
 
 Cassiero,
 
 105 Ohio St., 123, beginning at page 129, 136 N. E., 888. At that time I not only conceded that it was a general rule that misconduct of a juror must be shown by testimony of persons other than jurors themselves, but I also conceded that it was a rule of good policy. There was no question of misconduct in that case, and I there fore had made no analytical study of the proposition so far as it is affected by moral obliquity of the juror, and I now feel, upon having made a careful, intensive study of the subject, that I conceded too much, and that the views hereinbefore expressed sound the better and the safer doctrine.
 

 Allen, J., concurs in the dissenting opinion.